# BARRETT *v.* UNITED STATES

No. 74–5566.   Argued November. 4, 1975—
Decided January 13, 1976

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, and POWELL, JJ., joined. WHITE, J., filed a concurring opinion, *post,* p. 225. STEWART, J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post,* p. 228. STEVENS, J., took no part in the consideration or decision of the case.

*Thomas A. Schaffer,* by appointment of the Court, 421 U. S. 908, argued the cause and filed a brief for petitioner.

*Robert B. Reich* argued the cause for the United States *pro hac vice.*   With him on the brief were *Solicitor General Bork, Acting Assistant Attorney General Keeney,* and *Sidney M. Glazer.*

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

Petitioner Pearl Barrett has been convicted by a jury in the United States District Court for the Eastern Dis-

trict of Kentucky of a violation of 18 U. S. C. § 922 (h),[1] a part of the Gun Control Act of 1968, Pub. L. 90–618, 82 Stat. 1213, amending the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. 90–351, 82 Stat. 197, enacted earlier the same year. The issue before us is whether § 922 (h) has application to a purchaser's intrastate acquisition of a firearm that previously, but independently of the purchaser's receipt, had been transported in interstate commerce from the manufacturer to a distributor and then from the distributor to the dealer.

## I

In January 1967, petitioner was convicted in a Kentucky state court of housebreaking. He received a two-year sentence. On April 1, 1972, he purchased a .32-caliber Smith & Wesson revolver over the counter from a Western Auto Store in Booneville, Ky., where petitioner resided.[2] The vendor, who was a local dentist as

---

[1] "§ 922. Unlawful acts.

.          .          .          .          .

"(h) It shall be unlawful for any person—

"(1) who is under indictment for, or who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

"(2) who is a fugitive from justice;

"(3) who is an unlawful user of or addicted to marihuana or any depressant or stimulant drug (as defined in section 201 (v) of the Federal Food, Drug, and Cosmetic Act) or narcotic drug (as defined in section 4731 (a) of the Internal Revenue Code of 1954); or

"(4) who has been adjudicated as a mental defective or who has been committed to any mental institution;

"to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

[2] Petitioner at the time of the purchase was not asked to complete Treasury Form 4473, designed for use in the enforcement of the gun control provisions of the statute. Tr. 45–47. Accord-

well as the owner of the store, and who was acquainted with petitioner, was a federally licensed firearms dealer. The weapon petitioner purchased had been manufactured in Massachusetts, shipped by the manufacturer to a distributor in North Carolina, and then received by the Kentucky dealer from the distributor in March 1972, a little less than a month prior to petitioner's purchase. The sale to Barrett was the firearm's first retail transaction. It was the only handgun then in the dealer's stock. Tr. 36–47.

Within an hour after the purchase petitioner was arrested by a county sheriff for driving while intoxicated. The firearm, fully loaded, was on the floorboard of the car on the driver's side.

Petitioner was charged with a violation of § 922 (h). He pleaded not guilty. At the trial no evidence was presented to show that Barrett personally had participated in any way in the previous interstate movement of the firearm. The evidence was merely to the effect that he had purchased the revolver out of the local dealer's stock, and that the gun, having been manufactured and then warehoused in other States, had reached the dealer through interstate channels. At the close of the prosecution's case, Barrett moved for a directed verdict of acquittal on the ground that § 922 (h) was not applicable to his receipt of the firearm.[3] The motion

---

ingly, there is no issue here as to the making of any false statement, in violation of § 922 (a) (6). See *Huddleston* v. *United States,* 415 U. S. 814 (1974).

[3] The defense also moved to quash the indictment on the ground that on June 20, 1969, the Governor of Kentucky, by executive order in the nature of a pardon, had granted petitioner "all the rights of citizenship denied him in consequence of said judgment of conviction." It was suggested that this served to wipe out petitioner's state felony conviction of January 1967. The motion to quash was denied. The same argument was made in the Court of

was denied. The court instructed the jury that the statute's interstate requirement was satisfied if the firearm at some time in its past had traveled in interstate commerce.[4] A verdict of guilty was returned. Petitioner received a sentence of three years, subject to the immediate parole eligibility provisions of 18 U. S. C. § 4208 (a)(2).

On appeal, the Court of Appeals affirmed by a divided vote on the question before us. 504 F. 2d 629 (CA6 1974). Because of the importance of the issue and because the Sixth Circuit's decision appeared to have overtones of conflict with the opinion and decision of the United States Court of Appeals for the Eighth Circuit in *United States* v. *Ruffin,* 490 F. 2d 557 (1974), we granted certiorari limited to the § 922 (h) issue. 420 U. S. 923 (1975).

## II

Petitioner concedes that Congress, under the Commerce Clause of the Constitution, has the power to regulate interstate trafficking in firearms. Brief for Petitioner 7. He states, however, that the issue before

---

Appeals, but that court unanimously rejected it for reasons stated in the court's respective majority and dissenting opinions. 504 F. 2d 629, 632–634 (CA6 1974). The issue is not presented here.

[4] "Now, interstate commerce, ladies and gentlemen, is the movement of something of value from one political subdivision, which we call a state, to another political subdivision, which we call a state. Interstate commerce occurs when something of value crosses a state boundary line. Now, if you believe that from this evidence . . . the firearm in question was manufactured in a state other than Kentucky, then you are entitled to make the permissible inference that in order for that firearm to be physically located in Kentucky, . . . it had to be engaged in interstate transportation at some point or another, but this is a permissible inference. You are not required to make that inference unless you believe from the evidence that that is a logical, reasonable determination to make from the facts." Tr. 99–100.

us concerns the scope of Congress' exercise of that power in this statute. He argues that, in its enactment of § 922 (h), Congress was interested in "the business of gun traffic," Brief for Petitioner 11; that the Act was meant "to deal with *businesses,* not individuals per se" (emphasis in original), *id.,* at 14, that is, with mail-order houses, out-of-state sources, and the like; and that the Act was not intended to, and does not, reach an isolated intrastate receipt, such as Barrett's transaction, where the handgun was sold within Kentucky by a local merchant to a local resident with whom the merchant was acquainted, and where the transaction "has no apparent connection with interstate commerce," despite the weapon's manufacture and original distribution in States other than Kentucky. *Id.,* at 6.

We feel, however, that the language of § 922 (h), the structure of the Act of which § 922 (h) is a part, and the manifest purpose of Congress are all adverse to petitioner's position.

A. Section 922 (h) pointedly and simply provides that it is unlawful for four categories of persons, including a convicted felon, "to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." The quoted language is without ambiguity. It is directed unrestrictedly at the felon's receipt of any firearm that "has been" shipped in interstate commerce. It contains no limitation to a receipt which itself is part of the interstate movement. We therefore have no reason to differ with the Court of Appeals' majority's conclusion that the language "means exactly what it says." 504 F. 2d, at 632.

It is to be noted, furthermore, that while the proscribed act, "to receive any firearm," is in the present tense, the interstate commerce reference is in the present perfect tense, denoting an act that has been completed.

Thus, there is no warping or stretching of language when the statute is applied to a firearm that already has completed its interstate journey and has come to rest in the dealer's showcase at the time of its purchase and receipt by the felon. Congress knew the significance and meaning of the language it employed. It used the present perfect tense elsewhere in the same section, namely, in § 922 (h)(1) (a person who "has been convicted"), and in § 922 (h)(4) (a person who "has been adjudicated" or who "has been committed"), in contrast to its use of the present tense ("who is") in §§ 922 (h)(1), (2), and (3). The statute's pattern is consistent and no unintended misuse of language or of tense is apparent.

Had Congress intended to confine § 922 (h) to direct interstate receipt, it would have so provided, just as it did in other sections of the Gun Control Act. See § 922 (a)(3) (declaring it unlawful for a nonlicensee to receive in the State where he resides a firearm purchased or obtained "by such person outside that State"); § 922 (j) (prohibiting the receipt of a stolen firearm "moving as . . . interstate . . . commerce"); and § 922 (k) (prohibiting the receipt "in interstate . . . commerce" of a firearm the serial number of which has been removed). Statutes other than the Gun Control Act similarly utilize restrictive language when only direct interstate commerce is to be reached. See, e. g., 18 U. S. C. §§ 659, 1084, 1201, 1231, 1951, 1952, 2313, 2315, and 2421, and 15 U. S. C. § 77e. As we have said, there is no ambiguity in the words of § 922 (h), and there is no justification for indulging in uneasy statutory construction. *United States* v. *Wiltberger*, 5 Wheat. 76, 95–96 (1820); *Yates* v. *United States*, 354 U. S. 298, 305 (1957); *Huddleston* v. *United States*, 415 U. S. 814, 831 (1974). See *United States* v. *Sullivan*, 332 U. S. 689, 696 (1948). There is no occasion here to resort to a rule of lenity,

see *Rewis* v. *United States,* 401 U. S. 808, 812 (1971); *United States* v. *Bass,* 404 U. S. 336, 347 (1971), for there is no ambiguity that calls for a resolution in favor of lenity. A criminal statute, to be sure, is to be strictly construed, but it is "not to be construed so strictly as to defeat the obvious intention of the legislature." *American Fur Co.* v. *United States,* 2 Pet. 358, 367 (1829); *Huddleston* v. *United States,* 415 U. S., at 831.

B. The very structure of the Gun Control Act demonstrates that Congress did not intend merely to restrict interstate sales but sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous. These persons are comprehensively barred by the Act from acquiring firearms by any means. Thus, § 922 (d) prohibits a licensee from knowingly selling or otherwise disposing of any firearm (whether in an interstate or intrastate transaction, see *Huddleston* v. *United States,* 415 U. S., at 833) to the same categories of potentially irresponsible persons. If § 922 (h) were to be construed as petitioner suggests, it would not complement § 922 (d), and a gap in the statute's coverage would be created, for then, although the licensee is prohibited from selling either interstate or intrastate to the designated person, the vendee is not prohibited from receiving unless the transaction is itself interstate.

Similarly, § 922 (g) prohibits the same categories of potentially irresponsible persons from shipping or transporting any firearm in interstate commerce or, see 18 U. S. C. § 2 (b), causing it to be shipped interstate. Petitioner's proposed narrow construction of § 922 (h) would reduce that section to a near redundancy with § 922 (g), since almost every interstate shipment is likely to have been solicited or otherwise caused by the direct recipient. That proposed narrow construction would also

create another anomaly: if a prohibited person seeks to buy from his local dealer a firearm that is not currently in the dealer's stock, and the dealer then orders it interstate, that person violates § 922 (h), but under the suggested construction, he would not violate § 922 (h) if the firearm were already on the dealer's shelf.

We note, too, that other sections of the Act clearly apply to and regulate intrastate sales of a gun that has moved in intrastate commerce. For example, the licensing provisions, §§ 922 (a) (1) and 923 (a), apply to exclusively intrastate, as well as interstate, activity. Under § 922 (d), as noted above, a licensee may not knowingly sell a firearm to any prohibited person, even if the sale is intrastate. *Huddleston* v. *United States,* 415 U. S., at 833. Sections 922 (c) and (a) (6), relating, respectively, to a physical presence at the place of purchase and to the giving of false information, apply to intrastate as well as to interstate transactions. So, too, do §§ 922 (b) (2) and (5).

Construing § 922 (h) as applicable to an intrastate retail sale that has been preceded by movement of the firearm in interstate commerce is thus consistent with the entire pattern of the Act. To confine § 922 (h) to direct interstate receipts would result in having the Gun Control Act cover every aspect of intrastate transactions in firearms except receipt. This, however, and obviously, is the most crucial of all. Congress surely did not intend to except from the direct prohibitions of the statute the very act it went to such pains to prevent indirectly, through complex provisions, in the other sections of the Act.

C. The legislative history is fully supportive of our construction of § 922 (h). The Gun Control Act of 1968 was an amended and, for present purposes, a substantially identical version of Title IV of the Omnibus Crime

Control and Safe Streets Act of 1968. Each of the statutes enlarged and extended the Federal Firearms Act, 52 Stat. 1250 (1938). Section 922 (h), although identical in its operative phrase with § 2 (f) of the Federal Firearms Act, expanded the categories of persons prohibited from receiving firearms.[5] The new Act also added many prophylactic provisions, hereinabove referred to, governing intrastate as well as interstate transactions. See Zimring, Firearms and Federal Law: The Gun Control Act of 1968, 4 J. Legal Studies 133 (1975). But the 1938 Act, it was said, was designed "to prevent the crook and gangster, racketeer and fugitive from justice from being able to purchase or in any way come in contact with firearms of any kind." S. Rep. No. 1189, 75th Cong., 1st Sess., 33 (1937). Nothing we have found in the committee reports or hearings on the 1938 legislation indicates any intention on the part of Congress to confine § 2 (f) to direct interstate receipt of firearms.

The history of the 1968 Act reflects a similar concern with keeping firearms out of the hands of categories of potentially irresponsible persons, including convicted felons. Its broadly stated principal purpose was "to make it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency." S. Rep. No. 1501, 90th Cong., 2d Sess., 22 (1968). See also 114 Cong. Rec. 13219 (1968) (remarks by Sen. Tydings); *Huddleston* v. *United States,* 415 U. S., at 824–825. Congressman Celler, the House Manager, expressed the same concern: "This bill seeks to maximize the possibility

---

[5] Section 2 (f) provided:

"It shall be unlawful for any person who has been convicted of a crime of violence or is a fugutive [*sic*] from justice to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce . . . ." 52 Stat. 1251.

of keeping firearms out of the hands of such persons."
114 Cong. Rec. 21784 (1968); *Huddleston* v. *United
States,* 415 U. S., at 828. In the light of this principal
purpose, Congress could not have intended that the broad
and unambiguous language of § 922 (h) was to be con-
fined, as petitioner suggests, to direct interstate receipts.
That suggestion would remove from the statute the most
usual transaction, namely, the felon's purchase or re-
ceipt from his local dealer.

## III

Two statements of this Court in past cases, naturally
relied upon by petitioner, deserve mention. The first
is an observation made over 30 years ago in reference
to the 1938 Act's § 2 (f), the predecessor of § 922 (h):

> "Both courts below held that the offense created
> by the Act is confined to the receipt of firearms or
> ammunition as a part of interstate transportation
> and does not extend to the receipt, in an intrastate
> transaction, of such articles which, at some prior
> time, have been transported interstate. The Gov-
> ernment agrees that this construction is correct."
> *Tot* v. *United States,* 319 U. S. 463, 466 (1943).

In that case, the Court held that the presumption con-
tained in § 2 (f), to the effect that "the possession of a
firearm or ammunition by any such person [one con-
victed of a crime of violence or a fugitive from justice]
shall be presumptive evidence that such firearm or am-
munition was shipped or transported or received, as the
case may be, by such person in violation of this Act,"
was violative of due process.

The quoted observation, of course, is merely a recital
as to what the District Court and the Court of Appeals in
that case had held and a further statement that the
Government had agreed that the construction by the

lower courts was correct. Having made this observation, the Court then understandably moved on to the only issue in *Tot,* namely, the validity of the statutory presumption. The fact that the Government long ago took a narrow position on the reach of the 1938 Act may not serve to help its posture here, when it seemingly argues to the contrary, but it does not prevent the Government from arguing that the current gun control statute is broadly based and reaches a purchase such as that made by Barrett.[6]

The second statement is more recent and appears in *United States* v. *Bass, supra.*[7] The *Bass* comment, of course, is dictum, for *Bass* had to do with a prosecution under 18 U. S. C. App. § 1202 (a), a provision which was part of Title VII, not of Title IV, of the Omnibus Crime Control and Safe Streets Act of 1968, as amended. Section 1202 (a) concerned any member of stated categories of persons "who receives, possesses, or transports in commerce or affecting commerce . . . any firearm." The Government contended that the statute did not require proof of a connection with interstate commerce. The Court held, however, that the statute was ambiguous and that, therefore, it must be read to require such a nexus. In so holding, the Court noted the connection between Title VII and Title IV, and observed that although sub-

---

[6] There is, of course, no rule of law to the effect that the Government must be consistent in its stance in litigation over the years. It has changed positions before. See, *e. g., Automobile Club of Michigan* v. *Commissioner,* 353 U. S. 180, 183 (1957).

[7] "Even under respondent's view, a Title VII offense is made out if the firearm was possessed or received 'in commerce or affecting commerce'; however, Title IV apparently does not reach possessions or intrastate transactions at all, even those with an interstate commerce nexus, but is limited to the sending or receiving of firearms as part of an interstate transportation." 404 U. S., at 342–343.

sections of the two Titles addressed their prohibitions to some of the same people, each also reached groups not reached by the other. Then followed the dictum in question. The Court went on to state:

> "While the reach of Title IV itself is a question to be decided finally some other day, the Government has presented here no learning or other evidence indicating that the 1968 Act changed the prior approach to the 'receipt' offense." 404 U. S., at 343 n. 10.

The *Bass* dictum was just another observation made in passing as the Court proceeded to consider § 1202 (a). The observation went so far as to intimate that Title IV was to be limited even with respect to a transaction possessing an interstate commerce nexus, a situation that Barrett here concedes *is* covered by § 922 (h). In any event, the Court, by its statement in n. 10 of the *Bass* opinion, reserved the question of the reach of Title IV for "some other day." That day is now at hand, with Barrett's case before us. And it is at hand with the benefit of full briefing and an awareness of the plain language of § 922 (h), of the statute's position in the structure of the entire Act, and of the legislative aims and purpose.

Furthermore, we are not willing to decide the present case on the assumption that Congress, in passing the Gun Control Act 25 years after *Tot* was decided, had the Court's casual recital in *Tot* in mind when it used language identical to that in the 1938 Act.[8] There is

---

[8] "The verdict of quiescent years cannot be invoked to baptize a statutory gloss that is otherwise impermissible. This Court has many times reconsidered statutory constructions that have been passively abided by Congress. Congressional inaction frequently betokens unawareness, preoccupation, or paralysis." *Zuber* v. *Allen,* 396 U. S. 168, 185–186, n. 21 (1969).

one mention of *Tot* in the debates, 114 Cong. Rec. 21807 (1968), and one mention in the reports, S. Rep. No. 1097, 90th Cong., 2d Sess., 272 (1968) (additional views of Sens. Dirksen, Hruska, Thurmond, and Burdick). These reflect a concern with the fact that *Tot* eliminated the presumption of interstate movement, thus increasing the burden of proof on the Government. They do not focus on what showing was necessary to carry that burden of proof. Similarly, the few references to *Tot* in the hearings reflect objections to the elimination of the presumption, but mention only in passing the type of proof that the witness believed was necessary to satisfy § 2 (f). See, *e. g.*, Hearings on S. 1, Amendment 90 to S. 1, S. 1853, and S. 1854 before Subcommittee to Investigate Juvenile Delinquency of the Senate Committee on the Judiciary, 90th Cong., 1st Sess., 46 (1967); Hearings on H. R. 5037, H. R. 5038, H. R. 5384, H. R. 5385, and H. R. 5386 before Subcommittee No. 5 of the House Committee on the Judiciary, 90th Cong., 1st Sess., 561–562, 564, 677–678. Nothing in this legislative history persuades us that Congress intended to adopt *Tot*'s limited interpretation. If we were to conclude otherwise, we would fly in the face of, and ignore, obvious congressional intent at the price of a passing recital. See *Girouard* v. *United States,* 328 U. S. 61, 69–70 (1946). To hold, as the Court did in *Bass,* 404 U. S., at 350, that Title VII, directed to a receipt of any firearm "in commerce or affecting commerce," requires only a showing that the firearm received previously traveled in interstate commerce, but that Title IV, relating to a receipt of any firearm "which has been shipped or transported in interstate . . . commerce," is limited to the receipt of the firearm as part of an interstate movement, would be inconsistent construction of sections of the same Act and,

indeed, would be downgrading the stronger language and upgrading the weaker.

We conclude that § 922 (h) covers the intrastate receipt, such as petitioner's purchase here, of a firearm that previously had moved in interstate commerce. The judgment of the Court of Appeals, accordingly, is affirmed.

*It is so ordered.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

MR. JUSTICE WHITE, concurring.

In meeting petitioner's contention that *Tot* v. *United States,* 319 U. S. 463 (1943), necessarily confines the offense created by 18 U. S. C. § 922 (h) to the receipt of a firearm in the course of an interstate shipment, the Court reads the *Tot* opinion as reciting but not adopting the lower courts' holdings that § 2 (f) of the Federal Firearms Act of 1938 did not cover the intrastate receipt of a firearm that previously had moved in interstate commerce. *Ante,* at 221–222. I join the Court in this respect. Also, I find its construction of § 922 (h) to be correct even if it is assumed, as MR. JUSTICE STEWART concludes, *post,* at 228–230, and n. 3, that the *Tot* decision did adopt the more limited construction of § 2 (f).

Section 2 (f) of the Federal Firearms Act of 1938, 52 Stat. 1251, at issue in *Tot,* read as follows:

"It shall be unlawful for any person who has been convicted of a crime of violence or is a fug[i]tive from justice to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce, and the possession of a firearm or ammunition by any such person shall be presumptive evidence that such firearm or ammuni-

tion was shipped or transported or received, as the case may be, by such person in violation of this Act."

The opening words of the section broadly describing the statutory violation as receiving a firearm which "has been shipped or transported" in interstate commerce were immediately followed by a provision that it could be presumed from possession alone that the defendant-possessor had personally participated in the interstate movement of the possessed firearm. Had Congress intended to proscribe the mere intrastate receipt by a defendant of a gun which had previously moved in interstate commerce without any involvement by the defendant in that movement, there would have been little or no reason to provide that his personal participation in the interstate movement could be inferred from his possession alone. Proof of personal possession and previous interstate movement independent of any act of the defendant, which would be sufficient to make out intrastate receipt of a firearm which had previously moved in interstate commerce, requires no such presumptive assistance.

In this light it is not surprising that the otherwise broad language of the statute, which was not limited to receipts that were themselves part of the interstate movement, was nonetheless understood to reach only receipts directly involved in interstate commerce. *Tot* v. *United States, supra,* it is argued, so understood the statute. Striking down the presumption did not remove this gloss from the language defining the violation. Thus after *Tot,* and as long as Congress left § 2 (f) intact, to establish a violation of § 2 (f) it was necessary to prove that a convicted felon found in possession of a firearm actually participated in an interstate shipment.

When § 922 (h) was enacted, however, Congress

omitted the presumptive language of the prior statute and removed any basis for reading the plain language of the statute to reach only receipts of firearms which have moved in interstate commerce with the aid or participation of the defendant. That the plain language of § 922 (h) contains no limitation to receipts which are themselves part of an interstate movement is not disputed. Instead the argument is that by re-enacting the initial language of § 2 (f) Congress intended to maintain the restricted meaning even though it dropped the presumption which had provided the gloss and added nothing in its stead.

It is noted that Congress was aware that after *Tot,* "in order to establish a violation of this statute, it is necessary to prove that a convicted felon found in possession of a firearm actually received it in the course of an interstate shipment."\* From this it is inferred that in enacting § 922 (h) Congress adopted *Tot*'s interpretation of the glossed language of § 2 (f). But the quoted statement simply describes the continuing effect of the gloss provided by the language of the invalidated presumption in § 2 (f). Congressional awareness of the effect of *Tot* does not overcome the concededly plain language of § 922 (h) or the force of the Court's analysis of the statutory scheme of which it is a part. *Ante,* at 216–219. Indeed I find that congressional understanding of the history of § 2 (f), first with and then without its presumption, supports the Court's determination that § 922 (h) "covers the intrastate receipt . . . of a firearm

---

\*Hearings on S. 1, Amendment 90 to S. 1, S. 1853, and S. 1854 before Subcommittee to Investigate Juvenile Delinquency of the Senate Committee on the Judiciary, 90th Cong., 1st Sess., 46 (1967). See also Hearings on H. R. 5037, H. R. 5038, H. R. 5384, H. R. 5385, and H. R. 5386 before Subcommittee No. 5 of the House Committee on the Judiciary, 90th Cong., 1st Sess., 561 (1967).

that previously had moved in interstate commerce."
*Ante,* at 225.

Mr. Justice Stewart, with whom Mr. Justice Rehnquist joins, dissenting.

The petitioner in this case, a former convict, was arrested for driving while intoxicated. A revolver, fully loaded, was found on the floorboard of his car. These circumstances are offensive to those who believe in law and order. They are particularly offensive to those concerned with the need to control handguns. While I understand these concerns, I cannot join the Court in its rush to judgment, because I believe that as a matter of law the petitioner was simply not guilty of the federal statutory offense of which he stands convicted.

The petitioner bought a revolver from the Western Auto Store in Booneville, Ky., in an over-the-counter retail sale. Within an hour, he was arrested for driving while intoxicated and the revolver was found on the floorboard of his car. The revolver had been manufactured in Massachusetts and shipped to the Booneville retailer from a North Carolina distributor. The prosecution submitted no evidence of any kind that the petitioner had participated in any interstate activity involving the revolver, either before or after its purchase. On these facts, he was convicted of violating 18 U. S. C. § 922 (h), which makes it unlawful for a former criminal offender like the petitioner, "to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

This clause first appeared in the predecessor of § 922 (h), § 2 (f) of the Federal Firearms Act of 1938, 52 Stat. 1250, 1251.[1] In *Tot* v. *United States,* 319

---

[1] Section 2 (f) of the Federal Firearms Act provided:

"It shall be unlawful for any person who has been convicted of a crime of violence or is a fug[i]tive from justice to receive any

U. S. 463 (1943), the Court interpreted this statutory language to prohibit only receipt of firearms or ammunition as part of an interstate transaction:

> "Both courts below held that the offense created by the Act is confined to the receipt of firearms or ammunition as a part of interstate transportation and does not extend to the receipt, in an intrastate transaction, of such articles which, at some prior time, have been transported interstate. The Government agrees that this construction is correct." *Id.*, at 466.

Although the *Tot* Court was principally concerned with the constitutionality of the presumption established by the last clause of § 2 (f),[2] its interpretation of the first clause of the statute was essential to its holding.[3] The statutory presumption was that possession of a firearm or ammunition by any person in the class specified in § 2 (f) established receipt in violation of the statute. The Court in *Tot* held the presumption unconstitutional for lack of a rational connection between the fact proved

firearm or ammunition which has been shipped or transported in interstate or foreign commerce, and the possession of a firearm or ammunition by any such person shall be presumptive evidence that such firearm or ammunition was shipped or transported or received, as the case may be, by such person in violation of this Act."

[2] See n. 1, *supra*.

[3] The Court today reads the *Tot* opinion as only attributing this interpretation to the courts below and to the Government, and not as adopting it. *Ante*, at 221–222. This reading is mistaken, for in rejecting an argument premised on the power of Congress to prohibit all possession of firearms by felons, the *Tot* opinion stated:

"[I]t is plain that Congress, for whatever reason, did not seek to pronounce general prohibition of possession by certain residents of the various states of firearms in order to protect interstate commerce, but dealt only with their future acquisition *in interstate commerce*." 319 U. S., at 472 (emphasis added).

230

and the facts presumed. 319 U. S., at 467–468. The Court could not have reached that decision without first determining what set of facts needed to exist in order to constitute a violation of the statute.

The *Tot* case did not go unnoticed when 18 U. S. C. § 922 (h) was enacted in its present form in 1968, as the legislative history clearly reveals. Subcommittees of both the Senate and House Judiciary Committees in 1967 conducted hearings on bills to amend the Federal Firearms Act. At both hearings, the Commissioner of Internal Revenue explained the decision in *Tot:*

> "The Supreme Court declared [the presumption in § 2 (f)] unconstitutional in a 1943 case, *Tot* v. *United States,* 319 U. S. 463. Consequently, in order to establish a violation of this statute, it is necessary to prove that a convicted felon found in possession of a firearm actually received it in the course of an interstate shipment." Hearings on S. 1, Amendment 90 to S. 1, S. 1853, and S. 1854 before Subcommittee to Investigate Juvenile Delinquency of the Senate Committee on the Judiciary, 90th Cong., 1st Sess., 46 (1967).

> "The Supreme Court has declared [the presumption in § 2 (f)] unconstitutional. In order to establish the violation of the statute it is necessary to find that the felon found in possession of the firearm actually received it in the course of interstate commerce or transportation." Hearings on H. R. 5037, H. R. 5038, H. R. 5384, H. R. 5385, and H. R. 5386 before Subcommittee No. 5 of the House Committee on the Judiciary, 90th Cong., 1st Sess., 561 (1967).[4]

In both hearings, the Commissioner was speaking in support of bills that omitted the presumption held un-

---

[4] See also these Hearings, at 575 (statement of Commissioner of Internal Revenue), 629–630, 677–678 (statements of other witnesses).

constitutional in *Tot,* but that otherwise retained the same language there construed. See Hearings on S. 1, Amendment 90 to S. 1, S. 1853, and S. 1854, *supra,* at 16, 43–44; Hearings on H. R. 5037, H. R. 5038, H. R. 5384, H. R. 5385, and H. R. 5386, *supra,* at 13, 555. That is precisely the form in which the statute now before us, § 922 (h), was enacted in 1968. It is thus evident that Congress was aware of *Tot* and adopted its interpretation of the statutory language in enacting the present law. See *Francis* v. *Southern Pacific Co.,* 333 U. S. 445, 449–450 (1948); *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469, 488–489 (1940); *Commissioner* v. *Estate of Church,* 335 U. S. 632, 682, 690 (1949) (Frankfurter, J., dissenting).[5]

Just four years ago, in *United States* v. *Bass,* 404 U. S. 336 (1971), the Court expressly stated that it found nothing to indicate "that the 1968 Act changed the prior approach to the 'receipt' offense." *Id.,* at 343 n. 10. I would adhere to the Court's settled interpretation of the statutory language here involved and reverse the judgment of the Court of Appeals.

---

[5] The cases relied upon by the Court, *ante,* at 223 n. 8 and 224, stand for the quite different proposition that where it *cannot* be shown that Congress was aware of a decision of this Court interpreting a statute, such awareness cannot be presumed: *Zuber* v. *Allen,* 396 U. S. 168, 185–186, n. 21 (1969); *Girouard* v. *United States,* 328 U. S. 61, 69–70 (1946).